IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ENID CRUZ,

             Plaintiff,

    v.

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL
SECURITY,

            Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 15-1639 (JBS)

**OPINION**

APPEARANCES:

Adrienne Freya Jarvis, Esq.
800 North Kings Highway
Suite 304
Cherry Hill, NJ 08034
    Attorney for Plaintiff

Paul J. Fishman
UNITED STATES ATTORNEY
    By: Theresa A. Casey
        Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
330 Spring Garden Street
Philadelphia, PA 19123
    Attorney for Defendant

**SIMANDLE, Chief Judge:**

## Table of Contents

I.   INTRODUCTION ............................................. 2

II.  BACKGROUND ............................................... 5

  A.  Plaintiff's Medical Background, Generally .............. 5

  B.  Plaintiff's Social Security Benefits' Application ...... 10

  C.  ALJ's Decision and Affirmance by the Appeals Council ... 13

III. STANDARD OF REVIEW ....................................... 18

A.   Scope of Review, Generally ............................ 18

B.   Statutory and Regulatory Standards for Determination of

Disability .............................................. 20

IV. DISCUSSION ............................................. 21

A.   Whether Substantial Evidence Supports the ALJ's RFC

Assessment .............................................. 21

B.   Whether Substantial Evidence Supports the ALJ's Step Three

Analysis of Listing 12.05(C) ............................ 29

C.   Whether The ALJ Committed Error in His Evaluation of

Plaintiff's GAF Ratings ................................. 36

V.   CONCLUSION ............................................. 38

## I. INTRODUCTION

In this action, Plaintiff Enid Cruz (hereinafter, "Plaintiff"), a twenty-seven year old (on the alleged onset of disability date) Spanish-speaking female[1] with only one instance of prior work,[2] seeks review of the Commissioner of the Social Security Administration's (hereinafter, "Defendant") denial of her application for Social Security benefits pursuant to 42 U.S.C. § 405(g).

Plaintiff migrated to the United States from Puerto Rico in April 2009, and claims disability due to nervousness, mental

---

[1] Throughout the Social Security proceedings, examinations, and reviews, Plaintiff participated through either an English-speaking family member or an interpreter.

[2] Plaintiff's medical records reflect some subtle ambiguities on the issue of Plaintiff's prior employment. Nevertheless, Plaintiff herself acknowledged that her prior work history includes at least one janitorial job in Puerto Rico. (See, e.g., R. at 627.)

2

issues, and claustrophobia.  (See R. at 209)  In a seventeen-page decision dated September 24, 2013, the Administrative Law Judge (hereinafter, the "ALJ") denied her application for Social Security benefits.  (See R. at 25-42.)  As relevant here, the ALJ found that Plaintiff's mental and intellectual impairments, although severe, did not sufficiently impede her daily activities and adaptive functioning, and therefore allowed her to perform a mid-level range of exertional work subject to certain nonexertional limitations.  (See id. at 29-41.)  As a result, the ALJ found Plaintiff capable of obtaining employment in work that exists in significant numbers in the national economy, including a fruit cutter, produce weigher, bottling line attendant, and/or a sorter of agricultural produce.  (Id. at 41-42.)

In the pending appeal, Plaintiff argues that the ALJ erred (1) by improperly evaluating the functional capacity opinion of Stephen Rosenfield, M.A., the agency examining psychologist, (2) by erroneously applying the requirements of Listing 12.05 to the record evidence concerning Plaintiff's intellectual functioning, and (3) by arbitrarily considering the Plaintiff's ratings on the Global Assessment of Function, or GAF scale.[3]  (See generally

---

[3] The Global Assessment of Functioning, or GAF Scale, rates occupational, psychological, and social functioning, and aims to reflect the individual's overall level of functioning at the time of the examination.  See Rivera v. Astrue, 9 F. Supp. 3d

Pl.'s Br. at 7-21; Pl.'s Reply at 2-12.)  Defendant, by contrast, takes the position that substantial evidence supports the ALJ's decision denying disability benefits, because he appropriately reviewed the record evidence through the lens of the applicable statutory and legal framework.  (See generally Def.'s Opp'n at 10-22.)

The record evidence amply reflects Plaintiff's longstanding issues with depression and anxiety, and that these issues impaired (to some extent) her functional abilities. Nevertheless, the principal issue before the Court concerns whether substantial evidence supports the ALJ's conclusion that Plaintiff retained the residual functional capacity to perform medium level unskilled work, despite the limitations associated with her mental impairments.

For the reasons explained below, the Court will affirm the ALJ's decision denying Plaintiff Social Security benefits.

---

495, 496 n.1 (E.D. Pa. 2014) (citation omitted).  "The GAF scale, designed by the American Psychiatric Association, ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest." Id. (citation omitted).  A GAF of 41-50 reflects serious symptomatology, a GAF of 51-60 reflects moderate symptomatology, and a GAF of 61-70 reflects only mild symptomatology.  (See R. at 34 n.3 (citation omitted).)

## II.  BACKGROUND

### A.  Plaintiff's Medical Background, Generally

On July 7, 2009, Plaintiff, an individual with limited to no prior history of inpatient or outpatient psychiatric care,[4] presented herself (3 months pregnant) to Lehigh Valley Community Health Centers, Inc. (hereinafter, "LVCMHC"), with complaints of depressive, excessive crying, and generalized anxiety.  (See R. at 467-495.)  During her assessments at LVCMHC, by both a therapist and psychiatrist, Plaintiff explained that she has "suffer[ed] from nerves" since childhood (on account of various childhood traumas, including rape), and consistently feels depressed, anxious, and worrisome.  (Id. at 469.)  In addition, Plaintiff revealed that she completed very little if any formal education, lacked the ability to read or write, and was experiencing a number of life stressors, including caring for a husband with cancer and a child with special needs.  (Id. at 469-75.)

---

[4] Plaintiff stated to various medical providers that she had at least one and perhaps two psychiatric hospitalizations during her childhood in Puerto Rico (on account of behavioral difficulties and suicidal tendencies).  (See, e.g., R. at 482, 627.)  Nevertheless, the record dispels any suggestion of a psychiatric hospitalization during the period relevant to her Social Security benefits' application (i.e., after the alleged onset date of December 31, 2008), and each clinical assessment of Plaintiff revealed no suicidal and/or homicidal ideation. (See, e.g., R. at 490-94.)

The LVCMHC psychiatrist, Enrique M. Lirag, M.D., reported that Plaintiff complained of flashbacks, feelings of hopelessness, and depressive thoughts, and she appeared tearful during the evaluation. (See R. at 546-49.) Nevertheless, Dr. Lirag found Plaintiff cooperative, interested, friendly, and attentive, and reported normal impressions of her orientation, attitude, appearance, and affect. (See, e.g., R. at 482-85, 547-48.) Based upon his observations and Plaintiff's claimed symptoms, Dr. Lirag diagnosed Plaintiff with post-traumatic stress disorder (and a general adjustment disorder), assigned her a GAF score of 50 on account of her serious symptomatology (at that time), and prescribed medication to help stabilize her emotional symptoms. (Id. at 482, 488.) Indeed, although Plaintiff continued to experience issues with depression, Dr. Lirag observed improvements in her mood and affect, as well as marked reductions in her anxiety and depression, during his subsequent appointments with Plaintiff on September 29, 2009, October 18, 2009, and December 1, 2009.[5] (Id. at 490-94, 552-57, 664-66.)

---

[5] During this period, Dr. Lirag continued to modify Plaintiff's medication, in an effort to find the medication strength and type most appropriate for Plaintiff's concerns. Near the end of her pregnancy, however, Plaintiff's OB/GYN directed her to discontinue her medication, and on December 21, 2009, Dr. Lirag observed that Plaintiff's symptoms (when left untreated) increased in severity. (See R. at 664-65, 737.)

In connection with an earlier application for Social Security benefits,[6] Plaintiff attended a consultative examination with Stephen Rosenfield, M.A., on December 11, 2009.  (See R. at 558-67.)  During his evaluation, Mr. Rosenfield observed that Plaintiff appeared "obviously depressed," "easily distractible," and "hesitant" in stream of thought.  (R. at 564.)  Otherwise, however, Mr. Rosenfield found Plaintiff's mental status "appropriate."  (Id.)  Mr. Rosenfield then performed a test of Plaintiff's nonverbal intelligence (known as the TONI-3 test), in which Plaintiff achieved a score of 70, e.g., an IQ within the "[b]orderline range of [intellectual] ability."  (R. at 564.)  In addition, Mr. Rosenfield remarked that Plaintiff's ability to complete assignments and sustain work, given her

---

[6] In August 2009, Plaintiff applied for Social Security benefits, alleging, as she does here, that she had been disabled since December 31, 2008.  (See R. at 207-8.)  As part of this initial application, Plaintiff submitted limited medical evidence (mostly from non-examining state-agency psychologist, John N. Grutkowski) and completed a functional audit, describing, in greater written detail, the manner in which her claimed limitations impair her daily activities.  (See R. at 390-97.) In connection with the functional audit, Plaintiff claimed, as she does here, that she suffered from nervousness, limited intellectual skills, and an inability to adapt to changing circumstances.  (See id.)  Despite these limitations, Plaintiff professed an ability to take care of her household (including her husband and children), to go outside for walks (with her son or alone), to shop, to watch television, and to perform an array of physical activities (except heavy lifting and carrying due to her pregnancy).  (See id.)  The Social Security Administration, however, denied her 2009 application in early 2010 for lack of sufficient evidence of a qualifying disability.  (See R. at 207-8.)

mental condition, "would appear to be poor." (R. at 566-67.)
As a result of his observations, Mr. Rosenfield diagnosed
Plaintiff (consistent with Dr. Lirag) as suffering from major
depressive disorder, post-traumatic stress disorder,
claustrophobia, and borderline intellectual functioning. (R. at
566.)

On January 20, 2010, non-examining state-agency
psychologist, John N. Grutkowski, PhD, rendered an additional
mental residual functional capacity assessment of Plaintiff in
connection with her 2009 SSI application. (See R. at 568-596.)
In his assessment, Dr. Grutkowski found Plaintiff limited in her
ability "to understand and remember complex or detailed
instructions" and to work "with or near other employees without
being distracted by them." (R. at 570.) Nevertheless (and
unlike Mr. Rosenfield), Dr. Grutkowski found Plaintiff "able to
carry out very short and simple instructions," to "sustain and
ordinary routine without special supervision," and to "perform
repetitive work activities without constant supervision." (Id.)
On account of these functional capabilities, he found Plaintiff
"able to meet the basic mental demands of competitive work on a

sustained basis despite the limitations resulting from her impairment."[7]  (Id.)

Following that decision, Plaintiff presented herself to South Jersey Behavioral Health Resources (hereinafter, "SJBHR") on June 30, 2010, with renewed complaints of severe depression and issues with aggression.  (See R. at 610-25.)  During her mental status examination by SJBHR, Plaintiff displayed an "obviously" sad and depressed mood, and demonstrated cognitive functioning consistent with her "limited" education.  (See R. at 616-17.)  Aside from these limitations, however, the examination revealed normal mental findings relative to Plaintiff's emotional tone and reaction, thought processes and speech, and her general perception.  (Id. at 616-17.)  Nevertheless, the SJBHR examiner recommended that Plaintiff obtain treatment through individual psychotherapy and an additional psychiatric evaluation with Pedro Garcia, M.D.[8]  (Id.)

Dr. Garcia conducted his first psychiatric evaluation of Plaintiff on July 2, 2010 (and subsequently became her treating psychiatrist).  During his initial evaluation, Dr. Garcia

---

[7] Dr. Grutowski's finding, in turn, provided the principal basis for the SSA's denial of the Plaintiff's 2009 application.  (See R. at 207.)

[8] Medical management progress notes from October 2010, November 2010, May 2011, November 2011, March 2012, June 2012, September 2012, November 2012, and May 2013 reveal that Plaintiff remained calm (while medicated), that she complained of no new medical problems, and that she had "good support."  (See R. at 621-22, 649-658, 722, & 738.)

determined that Plaintiff suffered from major depressive
disorder and "low range" intelligence, and he assigned her a GAF
score of 55 (an improvement from Dr. Lirag's GAF rating of 50 in
2009). (R. at 623-25.) As in her prior evaluations, however,
Dr. Garcia found Plaintiff's appearance, behavior, affect, and
general otherwise within normal limits. (See id.) And he, like
Dr. Lirag, observed that Plaintiff responded favorably to
treatment. (See id.) Nevertheless, in serial opinions filed in
connection with Plaintiff's application for Social Security
benefits (from 2011 to 2013), Dr. Garcia opined that Plaintiff's
psychiatric issues (and specifically, her major depressive
disorder) rendered her incapable of working for in excess of 12
months. (See R. at 684-89, 746-49.)

**B.   Plaintiff's Social Security Benefits' Application**

Against this backdrop, on March 4, 2011, Plaintiff filed
the Social Security benefits' application at issue here,
claiming an inability to function and/or work as of December 31,
2008. (See R. at 209, 398-404.) In connection with the SSA's
review of Plaintiff's initial application, the New Jersey
Division of Disability Services conducted a face-to-face
interview of Plaintiff (through an interpreter) on April 18,
2011. (See R. at 412-15.) During the interview, the examiner
recorded little if any information, and noted that Plaintiff
"didn't seem to know much about anything," and could not provide

10

the "names, phone numbers or addresses" of the "other doctors"
she claimed to have seen.  (Id. at 413.)  As a result, the SSA
referred Plaintiff to David Bogacki, Ph.D, A.B.P.P.,[9] for a
"mental status examination to assess [her] allegation[s] of
nervousness, mental issues, and claustrophobia."[10] (R. at 627.)

During her examination with Dr. Bogacki on July 26, 2011,
Plaintiff (again) revealed her history of emotional problems and
nervousness dating back to childhood, and explained that her
family circumstances (a husband with a cancer and a child with
mental disabilities) exacerbated her emotional issues.  (Id.)
Despite these issues, however, Plaintiff claimed that she
assists her husband in caring for their children and the
household, requires no assistance on personal self-care tasks,
relates to others, and enjoys playing with her children and
going to the park.  (R. at 627-28.)  In addition, Plaintiff
demonstrated "[n]o psychotic symptoms," a normal affect, and an
intact judgment and insight, although her overall intellectual
functioning appeared "low average."  (Id.)  Based upon these

---

[9] The SSA likewise directed Plaintiff to appear for a
consultative examination, but she failed to attend.  (See R. at
211.)
[10] In the meantime, Plaintiff presented herself to Nueva Vida
Behavioral Health (hereinafter, "NVBH") on March 17, 2011, with
the same complaints of depressive, aggressive behavior, and
anxiety.  (See R. at 751-53.)  NVBH discontinued her treatment
on May 17, 2011, however, after Plaintiff failed to attend the
required counseling.  (See R. at 751 (noting Plaintiff's "non-
attendance").)

observations, Dr. Bogacki diagnosed Plaintiff with an adjustment disorder (all while ruling out a depressive disorder) and a learning disability, and assigned Plaintiff a GAF score of 65. (Id.)  In other words, Dr. Bogacki determined that Plaintiff demonstrated only mild mental symptomatology.

Based in large part upon Dr. Bogacki's assessment (along with the remaining medical evidence), the SSA's non-examining psychologist, Brady Dalton, Psy.D., found that Plaintiff's emotional issues and low intellectual capacity imposed some limitation on her memory and understanding, her ability to carry out detailed instructions, and her ability to complete a normal day without interruption from her psychologically-based symptoms.  (R. at 214-16.)  Nevertheless, given her ability to sustain employment in Puerto Rico and to care for herself and her family, Dr. Dalton reasoned that her conditions imposed "no more than moderate limitations in any cognitive domain," and that she retained the mental capacity for simple, unskilled work.  (R. at 212-13.)  The SSA therefore denied her initial application on August 3, 2011.  (See R. at 217-218, 244-46.)

Plaintiff requested reconsideration of this initial denial with present counsel on August 19, 2011.  (See R. at 219, 222, 230-32, 249-51, 418-22.)  In so requesting, Plaintiff claimed that her conditions had worsened and caused her to lose sleep, focus, and some sense of control.  (See R. at 220, 418.)

12

Plaintiff, however, supplied no additional medical evidence in support of these alleged changes. (See generally R. at 219-228.) Rather, Plaintiff merely relied upon the same information submitted in connection with his initial application, coupled with her allegation of worsening symptoms. (See generally id.) Given the absence of any additional evidence, in addition to the functional abilities demonstrated by Plaintiff despite her emotional/mental limitations, the reviewing non-examining psychologist, Richard Filippone, Ph.D., found the initial determination supported by the medical evidence, and denied Plaintiff's request for reconsideration on November 18, 2011. (See R. at 222-23, 226-28, 252-54.)

Following these denials, on November 29, 2011, Plaintiff requested, with counsel, a de novo hearing before an ALJ, and expressed an intention to provide additional medical evidence by no later than December 31, 2011. (See R. at 255-56.)

## C.   ALJ's Decision and Affirmance by the Appeals Council

On November 1, 2012, the ALJ, Jonathan L. Wesner, convened a hearing, at which time Plaintiff appeared, with counsel and an interpreter, and the ALJ received brief testimony from Plaintiff and Plaintiff's husband, followed by lengthy testimony of a vocational expert, Mitchell Schmidt. (See generally R. at 50-204.) As relevant here, Plaintiff testified concerning her janitorial work in Puerto Rico, her limited education, as well

13

as the general functional limitations resulting from her episodes of depression and nervousness. (See generally R. at 123-142.) Plaintiff's husband, Hector Rosario, then described Plaintiff's tendency to become hyper, upset, and easily worried, but he acknowledged that her behavioral issues improved through medication. (See generally R. at 143-51.) Following brief testimony from the vocational expert, the ALJ reconvened the hearing on June 12, 2013, and again on September 12, 2013, for the purpose of completing the testimony of the vocational expert.[11]

In the meantime, Kenneth Goldberg, Ph.D., performed an additional consultative examination of Plaintiff on December 18, 2012. (See R. at 692-96.) In his report, Dr. Goldberg observed that Plaintiff appeared "terrified," "extremely agitated," and "highly guarded" throughout the duration of the examination. (R. at 693-94.) Indeed, Plaintiff apparently "could not tolerate sitting in the waiting room" and had "trouble organizing her thoughts." (R. at 693.) Plaintiff acted similarly during the TONI-3 IQ testing, voiced concerns that Dr. Goldberg "would make fun of her" for any errors, and "took an

---

[11] Plaintiff raised issues regarding the vocational expert in her request for review of the ALJ's decision by the Appeals Council. (See R. at 460-66.) Plaintiff, however, mounts no challenge to the vocational expert in connection with the pending appeal, and so the Court need not retrace the lengthy, multi-hearing examination of the vocational expert.

unusually long amount of time trying to figure the answers out."
(Id.) As a result, Dr. Goldberg assigned Plaintiff a raw score
of 0, and determined that her clinical presentation appeared
"far more agitated" than depicted just one year prior by Dr.
Bogacki. (R. at 694.) Despite this alleged increase in her
symptomology, however, Dr. Goldberg reiterated the longstanding
diagnosis of Plaintiff as having major depressive disorder and
related mental deficiencies. (Id.)

Following the hearings (and the submission of the results
of Dr. Goldberg's examination), the ALJ issued a written
decision on September 24, 2013, in which he applied the five-
step sequential analysis to Plaintiff's application for Social
Security benefits. (See generally R. at 25-42.) The ALJ
concluded, at step one, that Plaintiff had not engaged in
substantial gainful activity (or any relevant work) since March
4, 2011, the filing date of Plaintiff's initial application for
Social Security benefits. (See R. at 27.) At steps two and
three, the ALJ found that Plaintiff suffered from a learning
disorder, major depressive disorder, an anxiety disorder, and
borderline intellectual functioning (see R. at 27-29),[12] but

---

[12] The record references Plaintiff's complaints of abdominal
pain, back pain, and issues associated with Plaintiff's weight
(and technical classification as obese). (See, e.g., 700-709.)
The ALJ found no consecutive period of ongoing abdominal and/or
back pain, and therefore deemed both of those complaints non-
severe. (See R. at 28.) The ALJ, however, accounted for

15

found that these impairments (or combination of impairments) did not meet or equal in severity any impairment found in the Listing of Impairments, including Listing section 12.02 ("Organic Mental Disorders"), 12.04 ("Affective Disorders"), 12.05 ("Intellectual Disability"), and 12.06 ("Anxiety-Related Disorders").  (see R. at 29-33.)  In so finding, the ALJ considered whether Plaintiff's exclusively mental impairments "result[ed] in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of [an] extended duration."[13] (Id.)  However, because Plaintiff's impairments caused only "mild restriction" in daily activities, "moderate difficulties" in social functioning, concentration, persistence, and pace, and no qualifying episode of decompensation, the ALJ found that Plaintiff's impairments did not meet or equal the severity of the Listing requirements. (R. at 29-33.)  In reaching these conclusions, the ALJ discussed, at length, the hearing testimony

_____

Plaintiff's obesity "in assigning a medium level of exertion in [her] residual functional capacity." (R. at 29.) Plaintiff does not challenge these findings here.
[13] The ALJ explained that a "marked limitation means more than moderate but less than extreme," and that repeated episodes of decompensation means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (R. at 29.)

concerning Plaintiff's functional abilities and limitations, in addition to the various clinical observations and diagnoses throughout the record evidence.  (See generally R. at 29-33.)

Then, in addressing Plaintiff's residual functional capacity, the ALJ evaluated, among other factors, Plaintiff's testimony and other statements regarding concerning restrictions and/or limitations on her abilities, the medical opinions rendered by the various consultative and non-consultative examiners, as well as the results of various mental and intellectual testing.  (See R. at 33-41.)  The ALJ, however, found that the record evidence indicated that Plaintiff suffered from impairments of a lesser "intensity, persistence, and limiting effect" than she professed.  (Id. at 34.)  In that respect, the ALJ recounted the evidence reflecting that appropriate medication resolved and/or substantially diminished Plaintiff's mental symptoms, and demonstrating that Plaintiff retained the ability to perform an array of simple, unskilled tasks (despite any intellectual limitations).  (See R. at 33-38.)

After surveying all of this evidence, the ALJ determined that Plaintiff possessed the residual functional capacity to perform medium, unskilled work that involves only rote, repetitious procedures with no more than 1, 2, or 3 steps, and only occasional interaction with co-workers and supervisors.

17

(See R. at 33.)  Based upon this RFC, the Medical-Vocational
Guidelines, SSR 85-15, and the consistency between the
vocational expert's testimony and the information contained
within the Dictionary of Occupational Titles, the ALJ then
determined that Plaintiff could perform work existing in
significant numbers within the national economy, and found
Plaintiff "not disabled."  (R. at 42.)

Following the decision, Plaintiff filed a formal request
for review on November 13, 2013 (see R. at 17), and submitted
briefing (but no additional evidence) concerning the ALJ's
errors of law and fact.  (See R. at 460-67.)  On January 27,
2015, however, the Appeals Council found "no reason" to review
the ALJ's decision, thereby rendering the ALJ's decision the
final administration decision in this action.  (R. at 1-3.)
Plaintiff timely filed this action, which Defendant opposes.
The Court has jurisdiction to review the Defendant's final
decision pursuant to 42 U.S.C. § 405(g).

III. STANDARD OF REVIEW

A.   Scope of Review, Generally

When reviewing the denial of disability benefits, the Court
must determine whether substantial evidence supports the denial.
Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v.
Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).  The
requirement of substantial evidence, however, constitutes a

18

deferential standard of review, see Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004), and does not require "a large or [even] considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988).  Rather, substantial evidence requires "more than a mere scintilla[,]" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), but generally less than a preponderance.  See Jones, 364 F.3d at 503.

In order to facilitate the Court's review, the ALJ must set out a specific factual basis for each finding.  Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975).  Additionally, the ALJ "must adequately explain in the record [the] reasons for rejecting or discrediting competent evidence," Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)), and must review all pertinent medical and nonmedical evidence "and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  However, the ALJ need not discuss "every tidbit of evidence included in the record." Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004).  Rather, the ALJ must set forth sufficient findings to satisfy the reviewing court that the ALJ arrived at a decision through application of the proper legal standards, and upon a complete review of the relevant factual record.  See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983).

19

**B.    Statutory and Regulatory Standards for Determination of Disability**

The SSA reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the SSA determines whether the claimant currently engages in "substantial gainful activity."  20 C.F.R. § 1520(b). In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment."  20 C.F.R. § 1520(c). Impairments lacking sufficient severity render the claimant ineligible for disability benefits.  See Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  Step three requires the Commissioner to compare medical evidence of the claimant's impairment to the list of impairments presumptively severe enough to preclude any gainful activity.  20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Step four requires the ALJ to consider whether the claimant retains the ability to perform past relevant work.  20 C.F.R. § 1520(e).  If the claimant's impairments render the claimant unable to return to the claimant's prior occupation, the ALJ will consider in step five whether claimant possesses the capability to perform other work existing in significant numbers in the national economy, given

the claimant's RFC, age, education, and work experience.   20

C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

## IV.  DISCUSSION

Here, Plaintiff presents three challenges to the ALJ's

finding, and the Court shall address each in turn.

### A.   Whether Substantial Evidence Supports the ALJ's RFC Assessment

In addressing Plaintiff's residual functional capacity, the

ALJ concluded, as explained above, that Plaintiff retained the

ability to perform medium, unskilled work, because she could

concentrate, regularly attend and sustain a routine, work at a

reasonable pace, and complete a work day.  (See R. at 33.)

Plaintiff argues that substantial evidence does not support

the ALJ's residual functional capacity assessment, because he

"erroneously evaluated" and "rejected" parts of the December

2009 report and opinion of Mr. Rosenfield, a state agency

consultative examiner.  (Pl.'s Br. at 7.)  More specifically,

Plaintiff claims (1) that Mr. Rosenfield opined that Plaintiff

could not perform sustained work (e.g., he found Plaintiff more

limited, in part, than the ALJ), and (2) that the ALJ failed to

evaluate Mr. Rosenfield's opinion in terms of its consistency

with the opinion of Plaintiff's treating psychiatrist, Dr.

Garcia.[14]   (See Pl.'s Br. at 7-11; Pl.'s Reply at 2-6.)

Defendant, by contrast, takes the position that the ALJ

appropriately discredited Mr. Rosenfield's opinion given its

inconsistency with other record evidence, and submits in any

event that substantial evidence supports the ALJ's overall

assessment of Plaintiff's residual function capacity.   (See

Def.'s Opp'n at 10-15.)   For the reasons that follow, the Court

finds that substantial evidence supports the ALJ's assessment of

Plaintiff's RFC.

An individual's residual functional capacity, or RFC,

constitutes the most the person can do in a work setting despite

the limitations imposed by the individual's impairments.   See 20

C.F.R. § 404.1545(a)(1).   In reviewing the record to make an RFC

assessment, the ALJ must take into account all the medical

opinion evidence along with all other relevant evidence in the

---

[14] In addition, Plaintiff argues that the ALJ erred in finding
Mr. Rosenfield not an "acceptable" medical source, because
licensed psychologists, like Mr. Rosenfield, qualify as
acceptable medical sources under 20 C.F.R. § 416.913(a)(2).
(Pl.'s Br. at 9; see also R. at 567 (identifying Mr. Rosenfield
as a licensed psychologist).)  In view of the plain language of
20 C.F.R. § 416.913(a)(2), the Court agrees that the ALJ erred
in finding Mr. Rosenfield not an acceptable medical source.  The
Court, however, finds the error harmless, because the ALJ did
not disregard any part of Mr. Rosenfield's opinion on account of
his designation. (R. at 39.)  To the contrary, the ALJ assigned
"great weight" to the majority of his opinion (and addressed it
in detail throughout his lengthy decision), and afforded "little
weight" to a narrow portion for reasons unconnected with his
designation. (R. at 39-40.)  In other words, his designation
had no adverse effect on his evaluation, and therefore provides
no basis for remand.

record, 20 C.F.R. § 404.1527(b), and must allocate weight to each medical opinion upon which the ALJ relies.  See Weidman v. Colvin, No. 14-552, 2015 WL 5829788, at *9 (M.D. Pa. Sept. 30, 2015).

In the face of conflicting evidence, however, the ALJ retains significant discretion in deciding whom to credit. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011) (noting that "the ALJ is entitled to weigh all evidence in making its finding" and the ALJ is not required to accept the opinion of any medical expert).  In applying that discretion, the opinions of state agency medical consultants, of course, merit significant consideration, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)), and the ALJ cannot simply "reject evidence for no reason or for the wrong reason."  Plummer, 186 F.3d at 429 (citation omitted); see also Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008) ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence.") (quoting Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)).  Nevertheless, the "ALJ — not treating or examining physicians or State agency consultants —

23

must make the ultimate disability and RFC determinations."
Chandler, 667 F.3d at 361 (citations omitted).

Applying these principles here, the Court finds that the
ALJ's RFC determination rests upon substantial evidence, and
that the ALJ committed no reversible error in his reliance upon,
or partial rejection of, Mr. Rosenfield's examining opinion.
Indeed, in reaching his RFC decision, the ALJ (1) surveyed the
broad landscape of record evidence, including the opinions of
treating, examining, and non-examining consultants, (2)
discussed chronologically, and at great length, the various
observations of Plaintiff's condition, as described throughout
the record evidence, and (3) provided a detailed explanation
concerning the evidence he credited and discredited (including,
most especially, Mr. Rosenfield).  (See R. at 33-41.)

Based upon this exhaustive review and discussion, the ALJ
noted Plaintiff's struggles with depression, anxiety, and
nervousness, but found that proper medication markedly abated –
and partially resolved – the severity of Plaintiff's symptoms.
(See R. at 37-39.)  In support of this conclusion, the ALJ
explained that the opinions containing the most adverse
observations of Plaintiff's mental state, occurred at times when
she had either (1) discontinued medication on account of her

pregnancy,[15] or (2) remained on a less effective dosage and/or type of psychotropic drug.[16]  (See id.)

Turning then to Plaintiff's borderline intellectual functioning, learning disorder, inability to understand English and her remaining mental impairments, the ALJ acknowledged Mr. Rosenfield's conclusions that (1) Plaintiff had a "poor" ability to sustain attention long enough to complete tasks, (2) moderate limitation in understanding, remembering, and carrying out short, simple instructions, (3) marked limitations with respect to detailed instructions, and (4) moderate limitations in social interaction.  (See R. at 39; see also R. at 557-67.)  Although the ALJ assigned great weight to the majority of his opinion, he

---

[15] As alluded to above, Dr. Lirag, one of Plaintiff's earlier treating physicians, prescribed her Zoloft in July 2009, and then continued to increase the dosage through September, October, and November 2009, in order to achieve the intended effect on Plaintiff's symptoms.  (See R. at 549.)  Dr. Garcia, Plaintiff's treating psychiatrist, again prescribed Plaintiff Zoloft in July 2010, but changed the medication to Lexapro and Klonopin, after the Zoloft appeared to be ineffective at controlling Plaintiff's symptoms.  (See R. at 618-20.)  Dr. Garcia adjusted her medications again in May 2013, and found Plaintiff's mental status normal and her mood calm during follow-up appointments.  (See R. at 722, 738-43.)  The ALJ noted Plaintiff's limited reaction to Zoloft, and her far more positive response to a combination of Lexapro and Klonopin.
[16] Then, in 2010, Plaintiff's treating psychiatrist, noted an increase in Plaintiff's depression and anxiety, again on account of the record evidence suggesting that she had discontinued her medication.  (See R. at 38.)  As his treatment of Plaintiff progressed (and she remained on her medication), however, Dr. Garcia reported marked reductions in Plaintiff's anxiety and depression, as well as improvements in her overall demeanor.  (See, e.g., R. at 630, 722-29.)

assigned "little weight" to Mr. Rosenfield's opinion on
Plaintiff's "poor" ability to sustain attention, based upon the
evidence that Plaintiff had discontinued her medication at the
time of her examination and the evidence that "her pathology had
increased as a result."[17]  (R. at 40; see also R. at 562-67.))

Plaintiff takes issue with the ALJ's interpretation of the
record evidence in this respect, because Mr. Rosenfield's report
reflects, as noted by the ALJ, that Plaintiff remained on Zoloft
and Trazodone during his examination.  (See Pl.'s Br. at 10 &
n.3.)  Nevertheless, the contemporaneous treatment records of
Plaintiff's then-treating psychiatrist, Dr. Lirag, do indeed
create the impression that Plaintiff had discontinued
medications.  (See, e.g., R. at 664 (treatment note dated
December 16, 2009), 665 (treatment noted dated December 21,
2009).)  Indeed, they appear to specifically state that
Plaintiff would "hold off on meds" until after her pregnancy,
and Plaintiff does not dispute that her condition improved while
medicated.  (See id.)  Even if Plaintiff remained on her
medications during this period, however, the record evidence (as
explained above) amply reflects that the combination of Zoloft
and Trazadone proved less effective in addressing Plaintiff's
symptoms.  Indeed, Plaintiff herself told Dr Garcia that Zoloft

---

[17] The ALJ declined to credit Mr. Rosenfield's GAF rating,
discussed below, for the same reason.

26

was not working and he changed her medication as a result. (See e.g., R. at 622.)

Beyond this, the ALJ opted to credit the findings and observations of the state agency psychological consultants (namely, Dr. Grutkowski, Dr. Dalton, and Dr. Filippone), all of which concluded that Plaintiff retained the ability to complete a normal workday and workweek without interruptions from her psychologically-based symptoms. (See R. at 40; see also 568 (finding Plaintiff not significantly limited on January 20, 2010), 214-15 (finding Plaintiff moderately limited on August 2, 2011), 224-25 (reaching the same conclusion on November 18, 2011).) Against that backdrop, the Court discerns no error in the manner in which the ALJ credited or discredited Mr. Rosenfield's opinion.

Nor does the Court conclude, as suggested by Plaintiff, that the ALJ erred by failing to resolve the consistency between Mr. Rosenfield's opinion and that of Plaintiff's treating psychiatrist, Dr. Garcia. (See Pl.'s Br. at 9; Pl.'s Reply at 4.) In serial examination reports submitted to the state disability agency in 2011, 2012, and 2013, Dr. Garcia concluded, without explanation, that Plaintiff could not perform work for a complete workday. (See, e.g., R. at 684-690.) The ALJ, however, did indeed address these serial reports, but found them of "lesser weight," given their unexplained inconsistency with

27

Dr. Garcia's treatment notes (and the annotations contained therein concerning Plaintiff's improvements). (R. at 40.) Even a cursory inspection of Dr. Garcia's treatment notes reflect their incongruity with the reports he submitted for purposes of Plaintiff's benefits' application (compare R. at 684-690, with R. at 630, 722-29), and the ALJ acted within his authority in deciding to assign Dr. Garcia's work-related opinions lesser weight, on account of their inconsistency with Dr. Garcia's own treatment records.[18] See Plummer, 186 F.3d at 429 (explaining that an ALJ may reject the opinion of a treating physician on the basis of inconsistencies and/or contradictory medical evidence); Coleman v. Comm'r of Soc. Sec., 494 F. App'x 252, 254 (3d Cir. 2010) (explaining that "if the opinion of a "treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason"); Brown, 649 F.3d at 197 n.2 (the "law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity").

    For all of these reasons, the Court finds that the ALJ's RFC determination rests upon substantial record evidence.

---

[18] Notably, Plaintiff does not challenge the ALJ's assessment of the inconsistency in Dr. Garcia's opinion, but instead only relies upon Dr. Garcia to the extent he rendered an opinion allegedly consistent with Mr. Rosenfield's.

**B.    Whether Substantial Evidence Supports the ALJ's Step Three Analysis of Listing 12.05(C)**

At step three, the ALJ evaluated whether Plaintiff's mental impairments, singly or in combination, met or medically equaled the criteria of Listings 12.02, 12.04, 12.05, and 12.06.  (See R. at 29-33.)  As relevant here, the ALJ concluded that Plaintiff met two of the requirements of Listing 12.05(C), namely an IQ or 60 through 70 and a work-related impairment in addition to her intellectual disability (e.g., a depressive disorder).  (See id. at 32.)  The ALJ found, however, that Plaintiff failed to meet the introductory requirement of Listing 12.05, because the record evidence did not, in his mind, demonstrate "sufficient deficits in [Plaintiff's] adaptive behavior."  (See id. at 33.)

Plaintiff argues that the ALJ rightly considered the Listing 12.05, but improperly evaluated its introductory part, by (1) defining the requirement too stringently through reference to, and reliance upon, the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (hereinafter, "DSM-IV"), and (2) by reaching an internally inconsistent step three finding without accounting for certain record evidence.  (See Pl.'s Br. at 12-20; Pl.'s Reply at 7-12.)  Defendant counters, however, that the ALJ appropriately resorted to the DSM-IV ad reached a step three finding consistent with applicable law and

the record evidence.  (See Def.'s Opp'n at 16-221.)  For the
reasons that follow, the Court finds that substantial evidence
supports the ALJ's step three determination.

Listing 12.05 defines intellectual disability as
"significantly subaverage general intellectual functioning with
deficits in adaptive functioning initially manifested during the
developmental period; i.e., the evidence demonstrates or
supports onset of the impairment before age 22."  20 C.F.R. pt.
404, subpt. P, app. 1 § 12.05(C).  Thus, before turning to the
specific requirements of Listing 12.05C (severity requirements
not at issue here), the plaintiff must demonstrate "'deficit[s]
in adaptive functioning'" prior to age 22.  Loepp v. Colvin, No.
15-51, 2015 WL 5638020, at *2 (W.D. Pa. Sept. 24, 2015) (quoting
Langdon v. Colvin, No. 13-635, 2014 WL 4660640 (W.D. Pa. Sept.
17, 2014)); see also Gist v. Barnhart, 67 F.App'x. 78, 81 (3d
Cir. 2003) ("before demonstrating the specific requirements of
Listing 12.05C, a claimant must show proof of a 'deficit in
adaptive functioning' with an initial onset prior to age 22);
Cortes v. Comm'r of Soc. Sec., 255 F. App'x 646, 651 (3d Cir.
2007) (explaining that, in order to meet the listing for mental
retardation, the claimant must prove, inter alia, "subaverage

30

general intellectual functioning with deficits in adaptive
functioning" manifesting before age 22).[19]

In determining whether the introduction of Listing 12.05
has been met, an ALJ may, in turn, consult the measurement
criteria of any one of the four major professional organizations
that deal with intellectual disability, including the American
Association on Intellectual and Developmental Disabilities (and
its *Manual of Diagnosis and Professional Practice in Mental
Retardation*) and/or the American Psychological Association (and
its various editions of the *Diagnostic and Statistical Manual of
Mental Disorders*).  See Jones v. Colvin, No. 14-282, 2015 WL
3646313, at *5 (W.D. Pa. June 10, 2015) (citing *Technical
Revisions to Medical Criteria for Determinations of Disability*,
67 Fed. Reg. 20018-01 (April 24, 2002)).  In other words, the
law does not require the ALJ to rely upon one specific test in

---

[19] Plaintiff would read out the introductory requirement of
Listing 12.05.  (See Pl.'s Reply at 7-8.)  In other words,
Plaintiff favors an interpretation of Listing 12.05 that
requires only satisfying of the severity requirements of subpart
C, without any independent showing on the "capsule definition"
of intellectual disability.  (See id.)  Nevertheless, the Court
of Appeals for the Third Circuit has flatly rejected that
interpretation, see, e.g., Cortes, 255 F. App'x at 651, as has
every Court of Appeals to have directly addressed the issue.
See, e.g., Libby v. Astrue, 473 F. App'x 8, 9 (1st Cir. 2012);
Talavera v. Astrue, 697 F.3d 145, 153 (2d Cir. 2012); Hancock v.
Astrue, 667 F.3d 470, 473 (4th Cir. 2012); Randall v. Astrue,
570 F.3d 651, 660 (5th Cir. 2009); Foster v. Halter, 279 F.3d
348, 354 (6th Cir. 2001); Novy v. Astrue, 497 F.3d 708, 710 (7th
Cir. 2007); Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir.
2006); Wall v. Astrue, 561 F.3d 1048, 1062 (10th Cir. 2009);
Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997).

determining whether the plaintiff "has the necessary 'deficits
in adaptive functioning' under this listing." Dignall v.
Colvin, No. 13-1572, 2015 WL 853679, at *4 (W.D. Pa. Feb. 26,
2015) (citations omitted).  In fact, the Social Security
Administration recognizes that each of the four leading
professional mental health organizations defines intellectual
disability, or adaptive functioning, in a slightly different
way, and allows any measurement method "'recognized and endorsed
by the professional organizations.'"  Harper v. Colvin, No. 13-
446, 2014 WL 1278094, at *7 (W.D. Pa. Mar. 27, 2014) (quoting
*Technical Revisions to Medical Criteria for Determinations of*
*Disability*, 67 Fed. Reg. 20018-01 (April 24, 2002)).

In beginning his discussion of Plaintiff's adaptive
functioning, the ALJ explained that the record evidence
demonstrated that Plaintiff "experienced reduced cognitive
function since childhood," i.e., some "deficit[] in adaptive
functioning" prior to age 22, because she "never learned to read
and write."[20]  (R. at 33.)  Nevertheless, in determining whether

---

[20] Based upon this introductory remark, Plaintiff claims that the
ALJ's step three analysis proves internally inconsistent,
because the ALJ supposedly "ruled that [Plaintiff] had the
adaptive deficits that the plain language of Listing 12.05
requires," but "then ruled that those same deficits" failed to
satisfy the capsule definition of intellectual disability under
Listing 12.05.  (Pl.'s Br. at 18-19; see also Pl.'s Reply at 10-
11.)  That position, however, ignores the realities of the ALJ's
conclusions, and the fact that Listing 12.05 requires deficits
in two areas (and not just a deficit in functional academic

32

Plaintiff's deficits actually met the "capsule definition" for

intellectual disability under Listing 12.05, the ALJ turned, as

required, to one of the recognized measurements, the DSM-IV.[21]

(See id.)   See also Jones v. Colvin, No. 14-282, 2015 WL

3646313, at *5 (W.D. Pa. June 10, 2015) (defining the DSM-IV as

---

skills).   Against that backdrop, his introductory remarks
demonstrate his immediate impression that Plaintiff suffered
from at least one deficit in adaptive functioning, namely, "a
limitation in functional academic skills;" while his proceeding
analysis then explains why he found no evidence of an additional
significant limitation.   (R. at 33.)   Plaintiff's argument on
the language of the ALJ's reasoning therefore lacks merit.
[21] For that reason, the Court finds no merit to Plaintiff's
contention that the ALJ improperly evaluated the "legal
standard" under Listing 12.05, by resorting to DSM-IV.   (See
Pl.'s Reply at 7-8.)   To the contrary, his failure to rely upon
the DSM-IV (or a related organizational measure) would arguably
have been a basis, on its own, for remand.   See, e.g., Shaw v.
Astrue, No. 11-139, 2012 WL 4372521, at *6 n. 8 (W.D. Pa. Sept.
24, 2012) (collecting cases, and finding that the ALJ's failure
to identify and apply one of the four standards of measurement
used by one of the professional organizations would require
remand); Logan v. Astrue, No. 07-1472, 2008 WL 4279820 (W.D. Pa.
Sept. 16, 2008) (same).   Nor, for substantially the same
reasons, can the Court agree that the ALJ violated Plaintiff's
procedural due process rights, by relying upon the DSM-IV for
definitional purposes without first proffering it to her.   (See
Pl.'s Reply at 9-10.)   Indeed, Plaintiff has provided no
convincing (much less binding) authority that procedural due
process requires advanced notice of medical texts for purposes
of defining technical terms, and instead cites cases concerning
an ALJ's reliance upon medical texts as substantive evidence.
(See Pl.'s Br. at 16-17.)   The ALJ committed no similar error in
this instance.   Nevertheless, even if procedural due process
mandated that Plaintiff be advised of the specific measurement
that the ALJ intended to use, she has not demonstrated (or even
argued) that the absence of notice resulted in any prejudice
sufficient to require remand.   See Smith v. Comm'r of Soc. Sec.,
501 F. App'x. 875 (11th Cir. 2012) (citation omitted)
(explaining that a claimant must establish prejudice "before a
due process violation will justify remand").

"[o]ne of the authorized resources).  More specifically, the ALJ
explained that "[d]eficits in adaptive functioning must include
a significant limitation in two of the following areas:
communication, self-care, home living, social/interpersonal
skills, use of community resources, self-direction, functional
academic skills, work, leisure, health and safety." (R. at 33 &
n.2 (citing DSM-IV at p.41).)  The ALJ noted, at the outset,
that Plaintiff suffered from a "limitation in [her] functional
academic skills," given her inability "to read and write."
(Id.)  Nevertheless, the ALJ found no additional significant
limitation, because the record evidence demonstrated that
Plaintiff could communicate, work (and had been employed for a
brief period), care for herself, engage in leisure activities,
manage her health and personal care needs, and use community
resources for medical treatment.  (Id.)

     Plaintiff mounts no challenge to these specific findings,
and instead only takes exception with these conclusions of the
ALJ to the extent he failed to discuss Dr. Goldberg's diagnosis
of Plaintiff as having a "Mental Deficiency" and Dr. Bogacki's
finding that Plaintiff "would need a payee" if found disabled.
(See Pl.'s Br. at 19-20; Pl.'s Reply at 12.)  Nevertheless, the
Court finds both arguments without merit.  Critically, although
Dr. Goldberg did indeed diagnose Plaintiff with a "Mental
Deficiency," his report itself provides no information from

which to divine his definition of that technical term, much less
any suggestion that he intended the term to be interpreted
consistently with DSM-IV.  (R. at 692-96.)  Similarly, although
Dr. Bogacki concluded that Plaintiff "would require a payee" if
awarded benefits, Plaintiff has made no showing that this
limitation, standing alone, constitutes a significant limitation
in one of the areas embodied in DSM-IV.  (R. at 627-69.)  Beyond
this, substantial evidence, particularly Plaintiff's own
statements, provide ample support for the ALJ's conclusion that
Plaintiff had no significant limitation in the areas of
"communication, self-care, home living, social/interpersonal
skills, use of community resources, self-direction," "work,
leisure, [and] health and safety."  (R. at 33.)  Indeed,
Plaintiff consistently explained her ability to care for herself
and home, to interact with others, to walk to the park (by
herself or with her son), to communicate with family, and to
rely upon community medical resources when necessary.  (See,
e.g., R. at 381, 413, 467-478, 559, 566, 627-28, 692-94.)  The
ALJ's opportunity to observe Plaintiff's demeanor at the hearing
is likewise entitled to deference on review.

     For all of these reasons, the Court finds that substantial
evidence supports the ALJ's conclusion that Plaintiff's
impairments did not meet or medically equal the requirements of
Listing 12.05.

## C.    Whether The ALJ Committed Error in His Evaluation of Plaintiff's GAF Ratings

Throughout his decision, the ALJ referred to and discussed the various GAF ratings assigned to Plaintiff throughout the record evidence.  (See, e.g., R. at 34-36, 39.)  Plaintiff claims that the ALJ's "arbitrarily" assessed the GAF ratings (particularly relative to the RFC determination), because he stated that GAF scores carry little weight in in making disability determinations, all while simultaneously according "'great weight' to GAF ratings 'between 55 and 65.'"  (Pl.'s Br. at 21 (citation omitted).)  The Court finds no error in the ALJ's discussion of the GAF scores.

Critically, the GAF score[22] constitutes little more than a "'numerical summary of a clinician's judgment of [an] individual's overall level of functioning," and has no "'direct correlation to the severity requirements'" under the Social Security Administration Rules.  Rivera, 9 F. Supp. 3d at 504 (citations omitted); see also Gilroy v. Astrue, 351 F. App'x 714, 715 (3d Cir. 2009).  Nevertheless, because the GAF score remains acceptable and reliable medical evidence, the ALJ must consider and weigh the importance of the GAF score, and must

---

[22] As explained above, the GAF Scale, rates occupational, psychological, and social functioning, and aims to reflect the individual's overall level of functioning at the time of the examination.  See Rivera, 9 F. Supp. 3d at 496 n.1 (citation omitted); see also Torres v. Comm'r of Soc. Sec., No. 14-6178, 2015 WL 8328346, at *2 n.3 (D.N.J. Dec. 8, 2015) (same).

specify the reasons, if any, for discounting it.  See Rivera, 9
F. Supp. 3d at 505 (citations omitted); see also Schaudeck v.
Comm'r of Soc. Sec., 181 F.3d 429, 435 (3d Cir. 1999) (citation
omitted) ("[w]here competent evidence supports a claimant's
claims, the ALJ must explicitly weigh the evidence....").

Here, the ALJ readily acknowledged the plethora GAF scores,
and specifically acknowledged Dr. Rosenfield's assessment of a
GAF score of 48.[23]  (R. at 39.)  Nevertheless, the ALJ accorded
that GAF score little weight, because Plaintiff had discontinued
her medications at the time of that assessment (an observation
amply supported by the record evidence, as explained above).
(Id.)  The ALJ then only credited the higher GAF scores, to the
extent he found them otherwise consistent with the overall
medical records, including the records of Plaintiff's treating
physicians.  (Id.)  In other words, the ALJ's decision plainly
illustrates his acknowledgment of the importance of GAF scores,
and the reasons he discredited the one especially low GAF score
contained within the record.  See Rivera, 9 F. Supp. 3d at 505

---

[23] In that way, this action differs from the more typical
situation in which the ALJ "cherry-pick[s]" high GAF scores and
ignores a plethora of lower GAF scores that may support a
disability.  Colon v. Barnhart, 424 F. Supp. 2d 805, 813-14
(E.D. Pa. 2006); see also West v. Astrue, No. 09-2650, 2010 WL
1659712, at *4-6 (E.D. Pa. Apr. 26, 2010) (remanding for failure
to consider an array of GAF scores).  Here, however, the ALJ
directly confronted the low GAF score, and discredited it for
reasons he amply explained.  (See R. at 39.)

(citations omitted).  As a result, the Court finds no error in the ALJ's evaluation of Plaintiff's GAF score.

**V. CONCLUSION**

For all of these reasons, the Court finds that substantial evidence supports the ALJ's decision to deny Plaintiff benefits, and that it should be affirmed.  An accompanying Order will be entered.


 **March 21, 2016**                         **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            Chief U.S. District Judge